```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF VIRGINIA
 2                         ALEXANDRIA DIVISION

 3  RENITA T. KALISZ,            )  Case 1:24-cv-684
                                 )
 4             Plaintiff,        )
                                 )
 5        v.                     )  Alexandria, Virginia
                                 )  January 31, 2025
 6  RAS TRUSTEE SERVICES, LLC,   )  10:22 a.m.
    et al.,                      )
 7                               )
               Defendants.       )
 8  _____)  Pages 1 - 15

 9
                 TRANSCRIPT OF MOTION TO DISMISS
10
                   FOR FAILURE TO STATE A CLAIM
11
            BEFORE THE HONORABLE LEONIE M. BRINKEMA
12
               UNITED STATES DISTRICT COURT JUDGE
13

14  APPEARANCES:

15  FOR THE PLAINTIFF:

16       JUSTIN CRINER, ESQUIRE
         THE BEALE LAW FIRM, PC
17       808 Moorefield Park Drive, Suite 110
         North Chesterfield, Virginia  23236
18       (804) n788-1500

19  FOR THE DEFENDANT SELECT PORTFOLIO SERVICING, INC.:

20       EDWARD J. LONGOSZ, II, ESQUIRE
         ECKERT SEAMANS CHERIN & MELLOTT, LLC
21       1717 Pennsylvania Avenue, N.W., Suite 1200
         Washington, D.C.  20006
22       (202) 659-6600

23


24


25     COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES


       Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599
```

```
 1                    P R O C E E D I N G S
 2            THE COURTROOM DEPUTY:  Civil Action
 3   1:24-cv-684, Renita Kalisz v. Ras Trustee Services,
 4   LLC, et. al.
 5            Will counsel please note their appearance for
 6   the record, first for the plaintiff.
 7            MR. CRINER:  Justin Criner on behalf of
 8   Ms. Kalisz.
 9            THE COURT:  All right, Mr. Criner.
10            And for the defense?
11            MR. LONGOSZ:  Good morning, Your Honor.  Ed
12   Longosz on behalf of the defense.
13            THE COURT:  All right.
14            This matter, again, comes before the Court on
15   the defendant's motion, SPS, to dismiss the second
16   amended complaint.
17            Now, the second amended complaint has six
18   counts in it.  Most of those counts the Court had
19   previously dismissed in an earlier hearing.  And I had
20   given the plaintiff leave, but only leave to file an
21   amended complaint involving two claims, the RESPA claim
22   and the FDCPA claim.
23            And so to the extent that in Count 1 of the
24   second amended complaint the plaintiff, without leave
25   of Court, re-added the TILA claim -- and Counts 3, 4, 5
```

1   and 6 all had issues that we had previously dismissed,
2   and they were refiled without leave of Court.  Those
3   are dismissed for the reasons I said previously.
4              So, what is before the Court today in the
5   motion to dismiss is the RESPA claim and the FDCPA
6   claim.
7              Now, on the FDCPA claim, my understanding
8   is -- and this is, again, the second amended complaint.
9   There's no clear allegation in that complaint that the
10  loan was in default when SPS began servicing the
11  mortgage.  And also, it is clearly a mortgage servicing
12  entity.  The statute clearly excludes that type of
13  entity.  And certainly, the case law in this circuit
14  has been that mortgage servicers in this status are
15  excluded from coverage of that statute.
16             So, Mr. Criner, I want you to respond to that
17  issue.  Number one, do you feel that you have alleged
18  in the second amended complaint clearly that the loan
19  was actually in default when the defendant, Select
20  Portfolio Servicing, Inc., began servicing the
21  mortgage?
22             MR. CRINER:  Good morning, Your Honor.
23             THE COURT:  Good morning.
24             MR. CRINER:  Yes, we have.  If the Court
25  recalls, in the initial part of the complaint -- this

1  originally was a loan held by Bank of America, and the
2  initial termination of the credit of HELOC was done by
3  Bank of America and subsequently transferred over to
4  SPS.  So at the time SPS took on servicing this loan,
5  Ms. Kalisz had already received notice of intent to
6  accelerate the allegations that she was in default.
7  She had already received the information that it had --
8  that the HELOC had been reduced.  And that's what
9  started the initial inquiries because her allegations
10 were that she had paid it.
11           And so the initial inquiry of Bank of America
12 is what started it.  So, when SPS took over the
13 servicing, Bank of America had already reduced the
14 HELOC down to zero, notice of intent to accelerate, put
15 her in default despite her having paid it.  That's what
16 started the initial disputes.
17           And when SPS took over the servicing, when
18 she got that notice, when they acquired it already in
19 default, that's when Ms. Kalisz began to send her
20 notices to SPS.
21           THE COURT:  Now, she previously in another
22 lawsuit sued Bank of America, correct?
23           MR. CRINER:  Yes.
24           THE COURT:  And you were her counsel in that
25 case?

```
 1                MR. CRINER:  Yes.
 2                THE COURT:  And that case was dismissed?
 3                MR. CRINER:  No, ma'am.  Well, I guess it was
 4   technically, yes.
 5                THE COURT:  Well, did it settle?
 6                MR. CRINER:  Yes.
 7                THE COURT:  All right.  And as part of the
 8   settlement, was there forgiveness?
 9                MR. CRINER:  No.
10                THE COURT:  It was still in default at that
11   point?
12                MR. CRINER:  Yes.
13                THE COURT:  But Bank of America did what?
14                MR. CRINER:  The Bank of America -- it
15   actually -- well, part of what we demanded in that
16   settlement was credit repair, and they declined that.
17   Bank of America simply agreed to -- in that particular
18   claim, more of it was about the negative reporting and
19   that aspect of it because they had already transferred
20   the loan.
21                Again, really, it was a money settlement, a
22   result with Bank of America.  They didn't take any
23   independent action.  We tried to demand that on
24   numerous occasions, but Bank of America declined to
25   credit anything to Ms. Kalisz.  They declined to do any
```

1  credit repair for Ms. Kalisz.  They simply decided they
2  would be willing to write a check.  And after a couple
3  of years of litigation, Ms. Kalisz finally agreed to
4  accept that.  They were no longer servicing the loan.
5              THE COURT:  Now, is she still living in the
6  condo?
7              MR. CRINER:  No, ma'am.  So she initially was
8  in that condo.  She's now got a different residence, a
9  home, but she does rent that condo.
10             THE COURT:  All right.  Okay.
11             Jumping ahead --
12             MR. CRINER:  Yes, ma'am.
13             THE COURT:  -- some of the materials that
14 were provided by the defendant indicate that, in fact,
15 your client, when she had the three-month test period
16 to work out perhaps a reduced arrangement with the
17 bank, that she made those three monthly payments.  And
18 they had agreed, as I understand it, to let her proceed
19 with the reduced monthly payments.  But she never
20 signed the paperwork that would have enabled that to go
21 forward.
22             Now, do you have an explanation as to why she
23 didn't sign?
24             MR. CRINER:  Yes, ma'am.  She disputes
25 receiving it.

```
 1                THE COURT:  I'm sorry?
 2                MR. CRINER:  She disputes receiving that
 3    document, and I think the evidence in the record kind
 4    of shows the Court that.  If the Court looks at our
 5    exhibits -- and first of all, that particular document
 6    was attached to their reply and not their motion to
 7    dismiss, and so we didn't even get a chance to respond
 8    to it.
 9                THE COURT:  That's now?
10                MR. CRINER:  Yeah.
11                THE COURT:  All right.
12                MR. CRINER:  And what's important about that
13    is if the Court looks at our exhibits -- and I believe
14    it's Exhibit 6, which is the last set of QWRs -- is one
15    of them in July sent to SPS says, "I made these three
16    modification payments.  I haven't heard anything else.
17    What is the status of it?"  And so it kind of defies
18    reason that she would receive it.
19                And then furthermore, even if they had sent
20    it to her and she sent that communication in July of
21    2023, then why is there not a response from SPS saying,
22    "We already sent this to you," or "sign the document we
23    sent you," or "here's the document again," right?
24                And so what we have is Ms. Kalisz sending a
25    communication in July saying, "I've made my three
```

```
 1  payments.  I haven't heard anything.  What's going on?"
 2              And so Ms. Kalisz disputes ever actually
 3  receiving that document.  Had she received it, she
 4  would have signed it.  And I think the Court can tell
 5  that because she subsequently continued to pay the same
 6  amount over that period of months until it was
 7  rejected.
 8              THE COURT:  Why don't you two settle this
 9  case?
10              MR. CRINER:  I think there is room to settle
11  this case.  I think that we made significant progress
12  at the settlement conference.  And I think the -- you
13  know --
14              THE COURT:  You met with Judge Davis; is that
15  right?
16              MR. CRINER:  Yes.
17              THE COURT:  And I know you settled with the
18  other defendant in the case.
19              MR. CRINER:  Yes.
20              THE COURT:  All right.  Let me hear from
21  defense counsel.
22              MR. CRINER:  Sure.
23              THE COURT:  Mr. Longosz.
24              MR. LONGOSZ:  Thank you, Your Honor.
25              I'll address the last question with respect
```

1  to the loan modification.  There's no allegation that
2  and nothing was put in the papers that the loan
3  papers -- the modification papers were not received.  I
4  know the Court the last time we were before the Court
5  asked questions about it, and we attached the
6  documents.
7           It's interesting that the loan modification
8  was offered in March, March 8, 2023.  That's in the
9  documents.  It was approved subject to a -- for the
10 trial period.  And we had discussion about that the
11 last time, 6-22-2023.  So those documents were
12 received.  There was a reminder sent on 7-17-2023, and
13 the modification withdrawal letter was sent on
14 8-7-2023.
15          So to the extent -- plaintiff can claim
16 whatever they want to claim, but with respect to SPS
17 and loan modification, those were the criteria for
18 offer acceptance and for the plaintiff to go forward
19 with the modification.
20          THE COURT:  I'm sorry.  So but for the
21 plaintiff not having signed the papers that you
22 maintain were sent to her, your client had no problem
23 with her working under the new modification?
24          MR. LONGOSZ:  They did because they could
25 not -- we -- the loan servicer is constrained by, you

1  know, federal regulations and other types of
2  regulations.  So the plaintiff -- to answer your
3  question, we had no problem proceeding, but the
4  plaintiff had to sign it, the loan modification, so
5  there was a contract in place.  And the plaintiff knew
6  there was a trial period.
7           THE COURT:  Right.  That was my question to
8  you.  I said but for her failure to sign the
9  modification agreement, right, your client would have
10 been perfectly comfortable with the modification going
11 into effect?
12          MR. LONGOSZ:  Absolutely.  We -- that's in
13 the papers.
14          THE COURT:  Right.  And after the three-month
15 test period, as I understand it, the three following
16 months she did tender the reduced amount.  The first
17 two of those post three-month tenders were accepted.
18 The third one was rejected because she had not signed
19 the papers because there was no actual written
20 agreement, correct?
21          MR. LONGOSZ:  She had -- no.  She had the
22 three.
23          THE COURT:  Right.
24          MR. LONGOSZ:  She missed the month of July
25 and then made three other payments and did not sign the

```
 1  loan modification agreement so that it could not be in
 2  place.  So those -- those payments -- in the final
 3  payment, there was a letter sent back saying, "We have
 4  to destroy your check because that check is not
 5  consistent with the loan, the note, the deed of trust,
 6  and everything else."
 7              THE COURT:  But the two preceding ones you
 8  did accept?
 9              MR. LONGOSZ:  They were applied and credited.
10              THE COURT:  Yeah.
11              MR. LONGOSZ:  But during this period of time,
12  we were waiting for the loan modification papers and
13  the reminder.
14              THE COURT:  All right.
15              MR. LONGOSZ:  And then we couldn't -- we
16  could not accept the modification without the signed
17  papers.
18              THE COURT:  Would your client at this point,
19  if there was some amount of catch-up, accept the
20  modification that had been out there?
21              MR. LONGOSZ:  Well, it would have to be a new
22  modification, and I think there is -- there's
23  absolutely room to do that, but the catch-up -- this
24  person hasn't paid anything.  They're delinquent by
25  1,903 days.
```

```
 1            THE COURT:  All right.
 2            MR. LONGOSZ:  And they just decided, well,
 3  we're going to send what that they presume to be a QWR,
 4  which we dispute.  We never got any of these by the
 5  way, Your Honor.
 6            THE COURT:  I'm sorry?  You never got what?
 7            MR. LONGOSZ:  SPS never received any of these
 8  QWRs that were allegedly sent to it.
 9            THE COURT:  You have no evidence of having
10  received any of them?
11            MR. LONGOSZ:  Zero, and we've gone top to
12  bottom.
13            THE COURT:  So we would have the plaintiff --
14  I mean, if this case were to go to trial, we would have
15  the plaintiff saying, "Here's the QWR that I sent.
16  They were not sent certified mail or anything that
17  would guarantee some evidence of receipt."
18            I'm asking, I guess, Mr. Criner, is that
19  correct?
20            MR. CRINER:  I don't believe so, ma'am.  I
21  checked into that already.
22            THE COURT:  All right.  So it's interesting.
23  She's claiming, 'Hey, I didn't get the contracts," and
24  you're claiming, "We never got the QWRs."  That's
25  terrible.  How do you try a case like that?
```

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

```
 1                MR. LONGOSZ:  It is, Your Honor, and it's --
 2   there's too many amazing coincidences in this case.
 3                THE COURT:  All right.
 4                MR. LONGOSZ:  There's multiple times when SPS
 5   reached out.  There's a whole log that would be
 6   proffered to show every time that SPS by phone or
 7   otherwise reached out and there was no response.  They
 8   couldn't get in touch with this individual.
 9                It's an investment property, but it's a
10   $23,000 loan principal that's left.  There's a $19,000
11   catch-up because for five years she just decided she
12   wasn't going to pay it.  And even if -- and so that's
13   where we are.  It's not a big case, but yes, if it goes
14   to trial, it's going to be interesting to see who the
15   jury believes.
16                And if the motion to dismiss is not granted,
17   we'll just take another run at it with summary
18   judgment.  I think the evidence is just going to be
19   overwhelming.
20                THE COURT:  All right.  Well, in terms of the
21   RESPA claim, I'm satisfied, frankly, that the required
22   written requests do not meet the legal standard.
23   That's one of things you've argued in your motion.  And
24   I'm going to go ahead and dismiss the RESPA count.
25                And then on the FDCPA count, again, it has
```

1  been the standard practice in this court that we have
2  found that the mortgage servicers are not within the
3  scope of the statute.  So I'm going to grant the motion
4  to dismiss.
5           But I still will say this:  You know, whether
6  or not the plaintiff chooses to appeal is certainly up
7  to her.  However, it would not be unwise for you at
8  this point to sit down and still try to settle the
9  case.  As you know, the Fourth Circuit has a very
10 aggressive mediation program.  Judge Davis has already
11 been with you-all once before, was successful in
12 bringing the plaintiff and the other defendant
13 together.
14          And this is not a big ticket case.  So you
15 both should think about -- you know, there's expense
16 involved in appeals as well.  You both should think
17 about getting it worked out.  If this is a property
18 where the plaintiff is, in fact, receiving some decent
19 revenue, there's no reason why a new arrangement can't
20 be worked out.
21          So that's my ruling.  Thank you.
22          MR. LONGOSZ:  Thank you, Your Honor.
23          MR. CRINER:  Your Honor --
24          THE COURT:  I've ruled.  I've got another
25 case I've got to take care of.  The whole second

```
 1  amended complaint is dismissed.
 2              MR. CRINER:  Thank you, Your Honor.  And
 3  that's all I wanted, was to note my objection.
 4              THE COURT:  Yes, the whole thing is
 5  dismissed.
 6              MR. CRINER:  The whole thing is dismissed.
 7              THE COURT:  That's right.
 8              MR. CRINER:  That's why, in case I needed it.
 9  There's going to be a final order?
10              THE COURT:  A final order.  Rule 58 goes on
11  it.  So if you're to take an appeal, you appeal within
12  30 days.  But as I've said, I think it would be wiser
13  trying to sit down with Judge Davis again to see if you
14  can work it out.
15              Thank you.
16              MR. CRINER:  Thank you, Your Honor.
17              THE COURT:  We'll now call the criminal case.
18         ------------------------------------
                      Time:  10:38 a.m.
19
20
21      I certify that the foregoing is a true and
22   accurate transcription of my stenographic notes.
23
24                                    /s/
                              Rhonda F. Montgomery, CCR, RPR
25
```

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599